today's calendar $21-1410 CV. Caccavo v. Reliance Standard Life Insurance Company. Good morning. Ms. is it Gizzone? Gizzone. Good morning. Very good. I understand you would like to reserve two minutes for rebuttal? Yes, your honor. Please proceed. May it please the court. I'm Evelyn Gizzone and I am counsel for plaintiff appellant Frank Caccavo. This court has repeatedly held that disability claims decisions that fail to accord the most basic rights to ERISA participants cannot be upheld. We are asking this court to consider how Reliance Standard, a conflicted decision maker, could cling to a claim that Mr. Caccavo is working when the administrative record contains substantial evidence that one, because of a permanent traumatic brain injury, he lacks the functional capacity to return to work. Two, he did not in fact return to work. And three, commission earnings he was receiving from his former employer were not associated with work and could not impact his monthly benefit. Our request today is twofold. One, under the authority of this court in HALO versus Yale health plan, because Reliance failed to strictly comply with the Department of Labor regulations governing ERISA claims, the district court should have applied a de novo standard of review to the claims and appeals decisions of the plan administrator. Second, upon a de novo review, but even if a heightened arbitrary and capricious standard of review were applied, based on the record evidence, the district court should not have come to the conclusion that Reliance's decision was reasonable or supported by substantial evidence. Additionally, even though there was a conflict administrator here, the court refused to accord any weight to that conflict. As our time is short, I will address the most significant issue in this case that really guided how this claim developed in that it was an error provided by Mr. Cacavo's employer. He was on a leave of absence. And they indicated when Reliance asked him that he was back at work. When Mr. Cacavo learned of this error, he provided more than 200 pages of statements of individuals who worked for Pushman and Wakefield, his employer. He provided statements of individuals who were the superiors of the persons who read a computer screen incorrectly and provided incorrect information. He provided medical information. He provided testing information, statements from other individuals, as well as additional... It seems like we're talking about two different things. One is the nature of the work that was performed by Mr. Cacavo, what he was doing on a daily basis. But that's not really the question, right? The question is what was the nature of the employment relationship, right? I'm not sure I understand the question. Are you asking about... because he had not returned to work. Well, but isn't that the question? I mean, someone could return to work for them. They may not do any work, but the employer says, well, I'm going to pay you anyway, right? Well, the commission statements that he was receiving, thank you for that question because I'd like to clarify the record on that. The commissions that he was receiving, he had been receiving since 2013 when he became disabled in May of 2013. And Reliance actually brought up this issue two times during the claim, in 2014 and in 2015, and asked, wait a minute, this is commissions you're receiving that are in fact substantial. And in both cases, both times, and this is part of the record, there were e-mails between different individuals at Reliance. It was agreed that this type of earnings, these commissions, effectively like passive earnings, could not impact his monthly benefit based on the policy language. So it wasn't... Well, but again, assuming, and I understand your argument about whether it should be de novo or arbitrary capricious, but if we were under an arbitrary and capricious standard, the fact is there was some evidence in the record that the insurance company was allowed to consider. And you may say, look, on balance it was wrong, but that, of course, is not our question. It's what's wrong and what's right. Simply it was the decision of the plan administrator arbitrary or capricious, which is quite a strong standard. And the fact is that if there were communications, which there appeared to have been, saying he's back at work, he's coming back, it is a different type of relationship where he may be working very little, but he's still back with us. We renewed a contract or entered into a new contract with him. Why would assuming that we were under the arbitrary and capricious standard, which I don't agree with, how is that not something that the plan administrator was allowed to look at in the sense that by looking at it, it's wholly capricious or arbitrary? Right. So I understand your question and your point. And what our position is is that after that happened, after that information went to Reliance Standard, of course they're allowed to look at it. Of course, they could look at everything that is presented to them. There was a correction to the record. So there was the only evidence in the record after they received that information is from Cushman and Whitefield saying that was erroneous. He actually has never returned back to work, including his supervisor, that would have been like the managing director at Cushman and Whitefield. In the record, he indicates he's never returned back to work. He continues to receive... But I thought that, again, there was some ambiguity, right? Didn't, I'm looking at the statement by Mr. Petrella that Mr. Cacavo, quote, was not working in the traditional sense. That's hedging, right? If you're not working in the traditional sense, that suggests he's working in a nontraditional sense, right? Well, that's one way to look at it, and that was like one sentence in that entire statement. But again, isn't that, it's a sentence that's there. Even when Cushman and Whitefield, as you say, tried to take it back and correct the error, they did so in a way that hedged. And if we're only looking at one sentence in the entire statement and disregarding all the other evidence, because in addition to that, there's also medical evidence where his condition, since the date of the statement you're referring to, where he had a third neuropsychological evaluation, his condition actually declined more, if possible. His doctor provided medical evidence that he said his condition has gotten to the point where it's not going to improve. And interestingly, Reliance's own medical department, subsequent to all of these statements going in, Reliance's own medical department indicated that they agreed with our clients attending neuropsychologists that all of this evidence supported that he lacked function, and they were very specific in their medical reviews. And this is all subsequent. So if we look at it as a timeline, you see an individual who's continuing to suffer, but his doctor is now performing objective testing, additional objective testing, confirming that, yes, he in fact is not capable of performing traditional work. He does not have that capacity. But you would agree that the employer was free to take him back even if they found he was incapable of performing traditional work. They could still enter into an employment relationship with him, whether out of a matter of generosity or perceived gratitude or some sort of moral indebtedness. They could still do that, right? I guess they could do that, but really when we look at the function, and one of the other things that I think is very, very important here is that the vocational review that was performed by Reliance early on in March, they never took into consideration any of the functionality issues, which is based on U.S. Supreme Court precedent is reason to find that the administrator was arbitrary and capricious. What do you do with the fact that your client has refused to produce financial records, which could cast light upon this issue, and why can't an insurance company say you have a duty to cooperate and you have a duty to make your case, and if you won't show us what your financial records are, then we're ready to take the slightest hint in the record that you're working and conclude that you're working? Respectfully, Your Honor, we disagree with Reliance's, the tenor at the time when they were requesting that information. It was two days into the appeal, and they had actually made a foregone conclusion that he was working. An appeal under ERISA is an opportunity for the insurer to present evidence and for a fresh set of eyes to look at that evidence and look at it objectively. So you're saying that the request was made and it was denied after the administrative record had closed? Well, that's actually accurate. That, in fact, did happen, yes. It was requested after, and also the request by Reliance was clear that it applied to a completely different policy provision that wasn't even part of the initial adverse benefit determination. Is your client getting benefits now from the insurance company? Instead of $24,000 a month, he's receiving $99 a month, which is the minimum monthly benefit under the policy, and that's been true since December of 2016. And is that based on allowance for what you call loyalty payments? At this point. And treating that as income? Yeah. At this point, there's not even a calculation being performed. They're just issuing a monthly benefit. Of $99? Of $99. Okay. You've reserved two minutes for rebuttal, so we'll hear from you again. Why don't we hear from counsel for the appellee, Mr. Bachrach? May it please the Court? Good morning. Joshua Bachrach. I represent the appellee here. The district court did not get it wrong, and I'd like to briefly address the standard of review question. Counsel argues that there was a failure to comply. That is incorrect. The ERISA regulation does not require you to put in the definitions. The regulation itself says that you have to reference the specific plan provision, and that was done in the initial decision letter. Counsel knew the basis for the decision, and it's funny because while she complains that reliance should have put in the definition of rehabilitative employment in his decision letter, she clearly knew it because in her own appeal letter, JA1193, she cites to that definition. So there's no harm, there's no misunderstanding, and there is no violation of ERISA. What is the evidence that he was back at work? I mean, I do understand that he wanted to go back to work. Many people who are severely disabled would love to go back to work, and he could tell his doctor he's planning to. The question is, what's the evidence that he was back at his desk? Okay. So that's a two-fold question. One is the employer sends a letter to him on September 2, 2016, saying that we welcome you back to work on September 6. Reliance didn't rely. Wasn't that corrected or contradicted by human resources? It was actually affirmed by human resources. In December, December 30, they write to Cushman and say, did he in fact return to work? And they say, yes, he did return on that September 6 date mentioned by Mr. Rudd months earlier. They then say, did his occupation change? Could you give me dates as well? Because, you know, September 6 is a limited use. It was September 6 of 2016. Thank you. So they told Reliance he did in fact return on that September 6, 2016 date mentioned previously. And then Reliance followed up and said, well, what it did is job duties changed. And they said, well, they're essentially the same classification, but it's not exactly the way he did it before. So how would they know if he hasn't in fact returned to work? But there's another part to the equation here. And counsel is making Mr. Cacavo sound like he's completely ---- What page of the record would I look at for the best evidence you have of the return to work? Because frankly, I don't ---- Sure. I mean, I see ambiguities here. But I think if I follow it through, he doesn't go back to work. Well, here it is, Your Honor. Essay 108, Mr. Cacavo states that he wants to contribute in a meaningful way in work. He then tells Reliance, Essay 64, that there are financial rewards ---- What's the page? Essay 64. He tells Reliance that there are financial rewards as part of this new agreement that we're going to get into shortly, and therefore he needed to return to work to get those financial rewards. Are those financial rewards associated with salary or compensation or commissions for work, or is that loyalty payments? It's not loyalty payments. Loyalty payments were passive, right? Yes. So they said ---- Yes and no. I mean, his team was doing work. Right. And he had entitlements to draw benefit from what his team was doing. Correct. But in 2016, all of this happens within a few months. He says, I want to return to work. They write to Dr. Prince, and Cushman does, and say, can he return to work? And he says, yes, in a limited way. And so then we have Cushman saying in a letter that he is returning to work. That's Essay 106. Then we have the fact that his status, and this is important, his status changed from a leave of absence to active. That is Essay 110. And in December of 2016, Essay 66, Cushman confirms that Mr. Cacavo had, in fact, returned to work on September 6th. This is substantial evidence, and it goes beyond that. So counsel, again, is trying to make it look like Mr. Cacavo is completely incapable of doing anything and refer to the 2017 neuropsychological evaluation. And if you look at it, and that starts on JA905, what you really see is overall cognition ability as estimated in the full-scale IQ is in the average verbal range, or average range. And then he's talking about processing score. That's in the low average range, but it's still there. He's talking about other things. Immediate recall is in the average range. Other things are in the high average range. Granted, there are things below average. We're not saying he's not disabled. That's a different question than whether he's doing some work, which he is according to the employer's own statement. So he's not incapacitated. He does have capabilities, and he's been making money from it. And so I'd like to turn to the— The benefit was $21,000 a month. So you're saying that if he has an average IQ and limited function, it can be expected his income would be $250,000 minus $99 a month? That's a disability question. This isn't a disability issue here, Your Honor. The question here is whether he is working and has earnings from that work that are applied to his benefits. So are you saying that it's calculated by reference to what the earnings are? Correct. And you're saying that those earnings exceed whatever the 20-something thousand a month times 12? So counsel has said two things that I'd like to correct in answering that question. One is that he's received the same number. Mr. Cacavo, my understanding, is different than her understanding, is that he is getting payments that are beyond $99 a month from Reliance Standard. In fact, there have been checks sent to him, and counsel knows this, that have been not cashed by him. For how much? Thousands and thousands of dollars. On a monthly basis or some sort of a settlement? No, no. So what happens is he has a monthly benefit, but then we get income information from the employer, Cushman, and then it is reconciled with the amount of benefits. So they'll say, okay, we paid you this much. We should have paid you this much. Here's some additional money. So he's getting paid more than $99 a month. Well, we can address that with opposing counsel, whether that's something, I don't know whether he's refusing payment so that it's not a concession that you're right or who knows. We'll hear. But they also reissue the checks. She asked them to reissue some of these checks. So counsel knows that more money has been paid to him. Well, this is outside the record, right? It is. You're correct. What is in the record, and I'd like to correct, is this, Your Honor. Counsel said that Reliance didn't ask for the renewal agreement until the appeal. That is false. Counsel is trying to nuance and say, well, you only asked for it. I think your point was that you did not seek the financial, the additional financial records until the record was closed. Correct. Correct. There was an accountant. But counsel said we didn't seek the renewal agreement until the appeal. And that's false. She's trying to nuance it by saying that we only requested in connection with investigating other income benefits, which are a separate way that benefits are reduced. Can you just clarify, when you say the word appeal, do you mean appeal to this court or do you mean appeal within the plan? Administrative appeal. So it is contrary to the comment there. Before the final decision, and under the law you have to look at what's in the record before the final decision, clearly it was requested multiple times. So that comment is incorrect. And it was not provided. And why wasn't it provided? Because counsel Did the company rely upon the failure, as you see it, to provide the financial records, data, as a basis for reducing the benefits? No. They relied on the evidence that was given to them. And I think that's fair. I think they did the fairest thing possible and relied on all of the evidence given to them. And, by the way, it wasn't just the reimbursement agreement that counsel refused to provide. We also asked for expenses and reimbursements because those would also say if he's out there meeting with people and submitting expenses, that would show he's working. Why would they refuse to provide that? But they did. You know, I look at it, well, first of all, this court has said there has to be a meaningful dialogue between a plan participant and the employer or the plan itself repeatedly. But that means a free flow of information. If something is needed by both sides, you ask and it's given. The side with control of that information can't say we're not giving it to you. And there's only one inference that can be raised from that. But, remember, he withdrew the authorization which would have allowed Reliance to get that information from Cushman. So now we couldn't even find out if there were expenses or reimbursements. So we could find out any financial information. So this isn't a question of correcting the record. This is a question of totally inconsistent information and Reliance trying to gain that information and then refusing. May I finish the thought? I want to finish your thought and give it 15 seconds. I will. If this was a disability case and the claimant said you're not getting my treatment records from my doctor, you'd have no problem in concluding they didn't support their claims and arguments. This is no different. There was evidence they refused to provide, and it can only reflect negatively. The decision should be affirmed, and I thank your honors. Thank you very much. Why don't we hear from Ms. Giosoni again. You have reserved two minutes for rebuttal. Thank you, your honors, and I think I'm going to have to speak very quickly. So with regard to just opposing counsel's information about what was presented by Cushman to Reliance, it was very clear as of July of 2017 that the supervisor, the boss of the persons that had provided the incorrect information, went so far as to give detail as to why that information was incorrect. And so she indicated in an email, a return-to-work date was entered into the HRIS system in error, which is why the information was reported to Matrix Reliance. Our HRIS system has since been corrected, as Mr. Cacavo has not returned to work since his leave began. And all of the evidence in the record subsequent to what Reliance received is consistent with that statement. There was an error reported, and Reliance has taken the position that— But we also have this ambiguous stuff from Mr. Petrella saying that your client has never returned to Cushman & Wakefield, quote, on a day-to-day basis, which suggests some hedging, right? Well, when we look at all of the evidence together, that may just be the way he described things, but none of the others— If we're under the arbitrary and capricious standard, why is it that they have to ignore the hedging and look at it in the light most favorable to the client? Because they are a fiduciary, and under the ERISA statute, they actually have to look at everything in the light most favorable to the insured participant, the beneficiary. That's the rule under ERISA, and they really are required to accord— But even to the point of ignoring the hedging language? But Mr. Petrella didn't say he had returned to work. And if we're focusing on one line in one statement, we're ignoring everything else that came after that, including Reliance's own medical department that has never stated that he had the functional capacity to return to work. There's no evidence in the record that Reliance's own medical— You said there's no evidence that he had the functional capacity to return to work. The question is, did he return to work with or without that functional capacity? And we believe that the record supports, after those errors were reported, that he has not. There's no evidence. Insurance companies are really good at surveillance. They're very good at trying to demonstrate that the claimant has done something untoward. But that's different here, right? I mean, I think the point just made is they could have hired him back for any number of reasons, right? And put him back under employment, even if they didn't think he was working much. But that would then vitiate every single statement of every individual that presented that to Reliance subsequent to that initial statement. Well, except for, for example, the line I just read, and there were a couple other things. Well, look, we've gone over time. I think we have your arguments. Unless there are further questions, we will take the case under advisement.  Thank you very much.